UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In Re: Administrative Subpoena No. 25-1431-017 to Children's Health Care d/b/a Children's Minnesota,

Case No.: _____

**CHILDREN'S HEALTH CARE D/B/A CHILDREN'S MINNESOTA'S MEMORANDUM IN SUPPORT OF MOTION TO QUASH SUBPOENA**

## INTRODUCTION

Every single Court to substantively analyze this exact subpoena has rejected the merits of the Government's position. In *In re Subpoena No.* 25-1431-014, 810 F. Supp. 3d 555, 607 (E.D. Pa. 2025), the United States District Court for the Eastern District of Pennsylvania, reviewed the exact same Subpoena at issue here and held, "Department of Justice has not shown Congress granted it authority to compel information relevant to its defined investigation under the Food, Drug, and Cosmetic Act," and "even if the information responsive to these three requests [Nos. 11-13] is relevant (and thus authorized by Congress for a subpoena), the children's and their families' privacy interests in their highly sensitive and confidential medical and psychological treatment in a charged political environment which considers their medical treatment to a radicalized warped ideology far outweigh the Department of Justice's shifting need for the information specifically identified in the three challenged requests." *Accord e.g., QueerDoc, PLLC, v. U.S. Dep't of Justice,* 807 F. Supp. 3d 1295 (Wd. Wa. 2025) (holding DOJ issued identical subpoena for improper purpose); *In re Administrative Subpoena No. 25-1431-019*, 800

F. Supp. 3d (D. Mass. 2025) (same); *In re Administrative Subpoena No. 25-1431-030,* No. 25-mc-00063-SKC-CYC (D. Colo. Jan. 5, 2026) (Dkt. 35) (granting motion to quash).[1] So too here.

Since 2019, parents have sought lawful, evidence-based gender-affirming care ("GAC") for their children from Children's Health Care d/b/a Children's Minnesota ("CMN"), a place where their families felt safe and confident in their care. In the summer of 2025, Department of Justice, consistent with the overall policy objectives of the Trump Administration (the "Administration"), served a broad and sweeping subpoena on CMN (the "Subpoena"), seeking years' worth of records of every patient under the age of nineteen who received gender-affirming care. These medical records are the most intimate kind these young patients could have, detailing their mental health, reproductive health, and sexual health. The government intrusion into their privacy therefore must be justified by compelling reasons. But the justification for this intrusion is clear: the Administration seeks to use the immense power of DOJ to threaten providers, intimidate families, and end gender-affirming care. "Gender-affirming care"[2] is legal in Minnesota, and state law requires insurance coverage for medically necessary gender-affirming care. Minn. Stat. Ann. § 62Q.585(1).1. The fact that a hospital like CMN provides services to patients in its gender care program and has treated lots of patients is not evidence of fraud.

Accordingly, no justification exists for the Administration's egregious violation of CMN patients' constitutional right to privacy in their personal medical records. CMN does not

---

[1] This list of Courts rejecting DOJ's position is not exhaustive. In fairness to DOJ, it has technically won on enforcement *once*. In a two-page order that addresses no substance of the issues, the United States District Court for the Northern District of Texas in Case No. 4:26-mc-00006-O, rubber-stamped an order granting a Petition to Enforce filed by the United States on May 1, 2026 before the subpoenaed-hospital could even file a responsive brief. (Dkt. 2).

[2] As defined under Minnesota law, "Gender-affirming care" means all medical, surgical, counseling, or referral services, including telehealth services, that an individual may receive to support and affirm the individual's gender identity or gender expression and that are legal under the laws of this state. Minn. Stat. Ann. § 62Q.585.3(c).

categorically contest the Department of Justice's authority to review its conduct or to initiate an investigation through a subpoena issued under Section 3486, but Requests 11, 12, and 13, and any and all other Requests to the extent that such Requests or sub-Requests call for the production of the identities or records of patients or their families of CMN should be quashed.

**BACKGROUND**

### I.     Children's Minnesota Provides Gender-Affirming Care

CMN is committed to providing evidence-based, high-quality and essential health care to all kids, including transgender and gender diverse patients. Ex. 1, CMN Provider Declaration at ¶ 3. CMN provides a safe and accepting environment for transgender and gender diverse youth and their families to ask questions, seek support and access evidence-based mental health and medical care. *Id.* at ¶ 4. CMN does not perform gender affirming surgeries. *Id.* at ¶ 7. CMN's Gender Health services include gender consultations with patient and family and mental health assessments and referrals as needed. *Id.* at ¶ 4-5. In addition, CMN offers treatment and monitoring, which can include: puberty blockers; gender affirming hormones; menstrual suppression; and fertility preservation consultation. *Id.* at ¶ 6.

### II.    The DOJ Subpoena Seeks Access to CMN's Privileged and Confidential Mental and Reproductive Health Records and Threatens Potential Federal Prosecutions

On January 28, 2025, President Trump issued Executive Order 14187 entitled "Protecting Children From Chemical and Surgical Mutilation."[3] The Order proclaimed that "[a]cross the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex

---

[3] Protecting Children From Chemical and Surgical Mutilation, THE WHITE HOUSE (Jan. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-fromchemical-and-surgical-mutilation/

through a series of irreversible medical interventions." *Id.* The Order equated "gender affirming care" with "chemical and surgical mutilation," directed the Attorney General to conduct investigations related to such care, and made clear that the purpose was to "end" gender-affirming care. *Id.*

Pursuant to Executive Order 14187, the Attorney General issued a Memorandum for Select Component Heads, titled "Preventing the Mutilation of American Children."[4] The Memo declared that "the Department [of Justice] will act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and directed "all U.S. Attorneys to investigate all suspected cases of [female genital mutilation ("FGM")]—under the banner of so-called 'gender-affirming care' or otherwise—and to prosecute all FGM offenses to the fullest extent possible." *Id.* at 3-4.

The Memo also directed DOJ "to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition'" and "investigations under the False Claims Act of false claims submitted to federal health care programs for any noncovered services related to radical gender experimentation." *Id.* at 4.

The Memo clearly articulates the purpose of those investigations:

Protecting America's children must be our top priority, whether from drug cartels, terrorists, or even our own medical community. Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind "gender-affirming care." Under my leadership, the Department of Justice will bring these practices to an end.

---

[4] U.S. OFF. OF THE ATT'Y GEN., MEMORANDUM FOR SELECT COMPONENT HEADS: PREVENTING THE MUTILATION OF AMERICAN CHILDREN (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl

*Id.* at 6. (emphasis added).

The Memo also announced that DOJ would "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners violating federal or state laws banning female genital mutilation and other, related practices." *Id.* at 5.

In addition to casting gender-affirming care as "mutilation," the Administration began equating gender-affirming care to child abuse. In April 2025, the Administration issued a Proclamation in connection with National Child Abuse Prevention Month stating that "the sinister threat of gender ideology" is "one of the most prevalent forms of child abuse facing our country today," specifically calling out "hormone therapy [and] puberty blockers."[5] The Administration "pledge[d] to stop the atrocity of child abuse in all its forms" and "affirm[ed] that every perpetrator who inflicts violence on our children will be punished to the fullest extent of the law." *Id.*

In June 2025, the Assistant Attorney General of the Civil Division wrote that the Civil Division will use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities" that provide gender-affirming care through the Food, Drug, and Cosmetic Act ("FDCA") and the False Claims Act.[6] On the same day, DOJ took action, issuing "more than 20 subpoenas to doctors and clinics involved in performing transgender medical procedures on children."[7] Again, the Administration's intent was

---

[5] National Child Abuse Prevention Month, 2025, THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-preventionmonth-2025/.

[6] U.S. OFF. OF THE ASSISTANT ATT'Y GEN., MEMORANDUM: CIVIL DIVISION ENFORCEMENT PRIORITIES 2–3 (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

[7] Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children, OFF. OF PUB. AFFS., U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.

clear, with the Attorney General stating that "[m]edical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by this Department of Justice." *Id.*

Since then, the Administration has escalated its effort to end the provision of gender-affirming care everywhere, including in states that have determined that it is permissible. On December 18, 2025, Health and Human Services Secretary Robert F. Kennedy, Jr. ("Secretary Kennedy"), issued a "Declaration" entitled "Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents" which declares that gender-affirming care in "children and adolescents" ("minors") "fail to meet professional [sic] recognized standards of health care." The Kennedy Declaration, if unchecked, would have allowed the Department of Health and Human Services ("HHS") to exclude healthcare providers from federal healthcare programs solely for providing minors with gender-affirming care. On April 18, 2026, however, a federal court struck down Secretary Kennedy's unlawful declaration. *Oregon v. Kennedy*, No. 6:25-CV-02409-MTK, 2026 WL 1048354, at *2 (D. Or. Apr. 18, 2026). The Court's holding established, among other things, that the Agency had overstepped its authority and "impeded [the State] Plaintiffs' rights to regulate the medical profession and their discretion to design their own statutorily-compliant Medicaid plans." *Id.* at *16.

On January 5, 2026, the General Counsel of HHS made clear its objective of ending the provision of gender affirming care by taking to Twitter/X[8] to announce that it was referring Children's Minnesota to the Office of the Inspector General:

---

[8] Available online at https://x.com/HHSGCMikeStuart/status/2008321502765093348 (accessed May 3, 2026).



Again, there is nothing unlawful in the State of Minnesota about billing for "hormone therapy" treatment for minors where such treatment has been deemed, by a licensed medical provider, to be medically necessary.

### III.   DOJ Subpoenas CMN

On June 11, 2025, DOJ served CMN with an administrative subpoena purportedly issued pursuant to 18 U.S.C. § 3486. *See* Ex. 2, CMN Subpoena. The subpoena's response deadline was originally July 9, 2025. *Id*. The subpoena contains 15 separate requests for documents that seek practically every document related to CMN's patients, staff, and providers concerning CMN's provision of gender-affirming care ("GAC") over five and a half years. *Id*. The subpoena seeks highly sensitive, personally identifiable medical information and records regarding, among others, minor patients, as well as personnel records for nearly all medical employees at CMN, extensive billing and diagnosis coding materials, and communications with third parties. *Id*.

Since receiving the subpoena, CMN has repeatedly conferred with the Government in order to better understand the information that the Department seeks and to comply with the requests. CMN agreed to produce many categories of records responsive to the Subpoena but told

the Department it could not compromise the privacy of its patients by providing their confidential

health information. On July 8, 2025, CMN objected to several of the requests relating to personal

identifying information of its patients. *See* Ex. 3, CMN Objections to Subpoena. As is relevant to

this motion to quash, CMN objected to Requests 11, 12, and 13, which seeks sensitive patient

information regarding:

- Request 11: "Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

- Request 12: "For each such patient identified in Subpoena [Request 11], documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

- Request 13: "All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks."

Ex. 2 at Requests 11-13.

The "Relevant Time Period" for documents to be produced pursuant to the Subpoena is

January 1, 2020, through the present. *Id*. Since the outset of this matter in June 2025, CMN has

attempted to confer with the Government to set acceptable redacted terms to protect the highly

sensitive personal information. However, last week, the Government indicated by teleconference

that anything short of unredacted records with at least some personally identifying medical

information would be considered noncompliance with the Subpoena. Thus, this motion to quash

follows.

IV. **CMN Moves to Protect its Patient and Former Patient's Highly Sensitive and Privileged Medical Records to Remain Private**

CMN moves on behalf of its patients and former patients who disclosed their medical

providers the most intimate details of their young lives, along with their parents. These are details

so deeply personal that no redaction can keep patients anonymous and protect their privacy. The medical records at issue include information about their homes, families, schooling, peers, mental health, reproductive health, gender identity, sexuality, treatment by others, and more. CMN patients sought this care with the understanding that the private and sensitive information shared would remain between their family and their healthcare providers. Yet DOJ now seeks highly personal medical records all while labeling the puberty blockers or hormone therapy received as "mutilation" and child abuse—despite the provision of such care being expressly legal under Minnesota law. *See* Minn. Stat. Ann. § 62Q.585.

This is a population of children that CMN physicians have already identified as lacking trust in the medical system. Ex. 1, at ¶¶ 16, 17, 26. Yet DOJ now seeks unfettered access to everything from their social security numbers and addresses to the intimate details they told their health care providers about their state of mind, their sexual orientation and gender identity, and the course of treatment they chose with their physician and parents. And DOJ has stated that it will not just scrutinize that information, but may share it with others.[9] DOJ seeks to do all this without notifying any family, let alone seeking their consent.

## LEGAL STANDARD

A subpoena may be enforced if four elements are met. The subpoena must be: (1) issued pursuant to lawful authority, (2) for a lawful purpose, (3) requesting information relevant to the lawful purpose, and (4) the information sought is not unreasonable. *Fresenius Med. Care v. United States*, 526 F.3d 372, 375 (8th Cir. 2008); *accord United States v. Westinghouse Elec. Corp.,* 788 F.2d 164, 166 (3d Cir. 1986) [hereinafter *Westinghouse II*]; *see also United States v.*

---

[9] U.S. OFF. OF THE ATT'Y GEN., MEMORANDUM FOR SELECT COMPONENT HEADS: PREVENTING THE MUTILATION OF AMERICAN CHILDREN 5 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl  ("I will partner with state attorneys general to identify leads, share intelligence, and build cases.")

*Morton Salt Co.,* 338 U.S. 632, 652 (1950). Concerning elements one, two and three, if "a subpoena is issued for an improper purpose, such as harassment" it cannot be enforced, because to do so "constitutes an abuse of the court's process." *Westinghouse II,* 788 F.2d at 166–67. Element four addresses those concerns by analyzing the reasonability of the information subpoenaed. "Persons from whom [an agency] seeks relevant information are not required to submit to [the agency's] demand, if in any respect it is unreasonable or overreaches the authority Congress has given." *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 217 (1946).

Layered on top of that four-element checklist are substantive protections. Notably, DOJ's need for information must be balanced against an individual's constitutionally protected right to privacy. *See United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 576 (3d Cir. 1980) [hereinafter *Westinghouse I*]. Section 3486 administrative subpoenas differ from federal grand jury subpoenas because they may only be issued in investigations concerning the limited universe of federal criminal offenses identified in the statute. *See* 18 U.S.C. § 3486(a)(1)(A).

Courts within the Eighth Circuit appear to have never addressed the *Westinghouse* framework for determining if an administrative subpoena is issued for an improper purpose when it seeks patients' personally identifying information. "While the United States Court of Appeals for the Eighth Circuit never specifically addressed [if the constitutional right to privacy extends to medical and prescription records], the court is confident the Eighth Circuit would give constitutional protection to those records." *Kurtenbach v. Jackley*, No. 16–5021–JLV, 2018 WL 1542499 at *9 (D.N.D. Mar. 29, 2018).  Indeed, in *St. Luke's Regional Medical Center, Inc., v. U.S.*, the United States District Court for the Northern District of Iowa applied the *Westinghouse* balancing test, but it never addressed the "improper purpose" analysis when the information requested included patients' personally identifying information from medical and prescriptions

records. 717 F. Supp. 665 (N.D. Ia. 1989) (enforcing administrative subpoena under 42 U.S.C. §11137(b) against hospital to investigate *doctor's records for Medicaid billing* fraud but not addressing or ordering disclosure of patients' personally identifying information). In *Eagle v. Morgan,* the Eighth Circuit recognized some categories of "inherently private" data that "must be considered extremely personal," and cited *Westinghouse* for "extending privacy protection to medical records." 88 F.3d 620, 625 (8th Cir. 1996).

Under the circumstances presented in this subpoena—which has been issued identically across the country—CMN submits that under *Westinghouse,* this Court should quash requests 11 through 13 because the *Westinghouse* factors favor protection of patient personally identifying medical information. (*See* Argument at §IV). Importantly, the Court need not address the *Westinghouse* factors if it decides the Subpoena requests fail to meet the other elements for enforcement (*See* Argument at §§I-III).

**ARGUMENT**

### I.      Element One: The Subpoena Lacks Lawful Authority.

To be enforceable, an administrative subpoena must be issued for a congressionally authorized purpose. *U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 726 (1st Cir. 2022). Here, the subpoena was issued pursuant to 18 U.S.C. § 3486, through which Congress authorized investigations into a "federal health care offense." *See* 18 U.S.C. § 24. However, the requests included in the subpoena are not aimed at investigating any such offense. Instead, they are aimed at regulating (and chilling) a particular type of medical care, with the goal of eliminating it nationwide, even where access to that care has been explicitly enshrined in state law. Manufacturing a federal criminal law enforcement investigation to obstruct lawful medical care—

11

based on the Administration's policy views—is improper and exceeds the bounds of congressional authorization.

The Supreme Court has consistently affirmed that the "regulation of health and safety is 'primarily, and historically, a matter of local concern.'" *Hillsborough Cnty. V. Automated Med. Lab'ys, Inc.,* 471 U.S. 707, 719 (1985). While Congress may "set uniform national standards in these areas," it has done so sparingly. *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006). Moreover, when the federal government seeks to disrupt that historical balance, courts look for a clear indication that Congress intended to do so. *West Virginia v. EPA*, 597 U.S. 697, 722-24 (2022) (citing Oregon as example of "major questions doctrine"). There is no such congressional statement here.

Minnesota has protected gender affirming care under its state law.  Minn.  Stat.  Ann.  § 62Q.585. In fact, "no health plan," in Minnesota may "exclude[] coverage for medically necessary gender affirming care." *Id.* 62Q.585.1(1). The services CMN offers exactly match what is not simply *permitted* but *required* under Minnesota state law. *Compare* Ex. 1, ¶¶ 8-15, *with* Minn. Stat. Ann. §62Q.585.3(b), defining "Gender-affirming care."  CMN is located in Minnesota and provides services in accordance with the standards of care under its state law. Interference with such care would not only contravene state law but also undermine CMN's duty to provide comprehensive, patient-centered care in accordance with the rights guaranteed to all Minnesota residents.

## II. Element Two: The Subpoena Requests for Personal Identifying Patient Information are Not for a Lawful Purpose.

Courts have long recognized that HIPAA subpoenas may be "resisted if the agency acted in 'bad faith,'" including when subpoenas are used to harass or pressure recipients. *United States v. Markwood*, 48 F.3d 969, 978 (6th Cir. 1995). An Administrative Subpoena issued in bad faith

12

categorically fails to meet an authorized purpose. CMN reincorporates the Background summary of DOJ and the Government's motivations to prevent all access to gender affirming care in bringing this Subpoena as if fully set forth herein. (See Background at §§ I-II, *supra*). In lockstep with that directive, DOJ issued this subpoena to CMN seeking, among other things, documents identifying minors receiving gender affirming care (Request No. 11) and the medical basis for providing that care (Request No. 12). The use of a criminal health care fraud investigative tool to block access to lawful medical care not only lacks a legitimate enforcement purpose—it exemplifies improper purpose and "bad faith." *Markwood*, 48 F.3d at 978.

Where, as here, Requests 11 – 13 explicitly seek personal identifying information of minor patients, it is apparent that the information is not connected to any lawful purpose. The government has failed to articulate any suspicion of wrongdoing by CMN that would justify the subpoena's intrusion, and it is well-established that issuing a subpoena in search of "wrongdoing, as yet unknown" is not a congressionally authorized purpose. *In re Sealed Case (Administrative Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994). As the Supreme Court has explained, a subpoena is not a roving license to troll for any evidence of wrongdoing. *United States v. R. Enters.*, 498 U.S. 292, 299 (1991).

Yet that is what the government is seeking to do. The subpoena's purpose is clear: it was issued to effectuate the President's executive orders and DOJ's memoranda that explicitly seek to bring an end to a type of medical treatment that is both lawful and recognized under Minnesota law, yet that this Administration disfavors. (See Background at §II, *supra*). "Both the EO and the Bondi Memo strongly suggest that the purpose of investigating possible violations of the FDCA are to end gender-related treatment for minors." *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041-JHC, 2025 WL 3562151, at *5 (W.D. Wash. Sept. 3, 2025). This purpose

has been manifested more recently in other administrative statements and actions, including the Kennedy Declaration that a federal court recently struck down and the HHS Office of General Counsel's very public referral of CMN for further investigation for the mere act of providing care that is lawful in the State of Minnesota. *See supra* at Background §II.

This has never been a legitimate purpose for a law enforcement investigation pursuant to 18 U.S.C. § 3486, the statute under which DOJ purports to derive authority. Any grounds for the subpoena asserted by DOJ are wholly pretextual. There have been no allegations regarding improper billing, off-label promotion, or any other, fraud at CMN. Moreover, precedent makes clear that limitations on off-label promotion of pharmaceutical products imposed by the Federal Food, Drug, and Cosmetic Act ("FDCA") do not restrict doctors' ability to prescribe medications for their patients. *See, e.g., Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001). Further, the practice of medicine is generally a question of state, not federal law. The Trump Administration is not authorized to set national medical policy, much less through the law enforcement process, as it has attempted to do. The subpoena fails to demonstrate it is tied to a lawful purpose. "No clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating" through the Subpoena. *QueerDoc*, 807 F. Supp. 3d, at 1303.

The DOJ's actual purpose with its subpoenas nationwide has been evident in other ways. For example, it appears to have even dropped identical subpoenas altogether where hospitals have agreed to cease providing services,[10] which would make no sense if the

---

[10] *See e.g., In Re 2025 Children's Hospital of Los Angeles Subpoena, No. 2:25-cv-11183-MWC-JDE, (C.D. Cal. Jan. 22, 2026) (Dkt. 25-1,* Settlement Agreement).

14

purpose of the subpoena were to investigate and take action against past acts of fraud that have already occurred and that purportedly warrant enforcement under 18 U.S.C. § 3486.

### III.     Element Three: The Subpoena Requests for Personal Identifying Patient Information are Not Relevant to Lawful Purpose.

To enforce an administrative subpoena, a court must also determine that the information sought is relevant to the authorized purpose. *Ricco Jonas*, 24 F.4th at 726 (citation omitted). Here, Subpoena requests 11-13 for personally identifying patient information of minor children and their parents do not seek documents or information related to any authorized purpose. "Rather than limiting its request for patient data to some criteria relevant to an ostensible investigation into misbranded labeling," the Government "Requests 11 to 13 create a dragnet designed to sweep in all patient data related to any prescription of puberty blockers or hormone therapy." *In re Administrative Subpoena No. 25-1431-030,* No. 25-mc-00063-SKC-CYC, at 6-7 (D. Colo. Jan. 5, 2026).

First, even if the government's objective was to uncover billing fraud, requests 11-13 are not relevant to that type of investigation. Patient records that identify them by name (Request No. 11) and detailed information about the medical basis for treatment and patient consent (Request Nos. 12 and 13) are wholly unnecessary to an investigation into improper billing premised on the notion that a hospital might seek to hide the true nature of the care provided. It is theoretically possible that the medical basis for treatment could be relevant to a billing investigation if DOJ claims the wrong codes were used. However, this does not permit DOJ to force the disclosure of patient's specific biographical information to determine whether the correct code was used for treatment. In rejecting enforcement to produce documents responsive to these exact requests, the United States District Court for the Eastern District Pennsylvania observed:

15

Requests 11, 12, and 13 seek child-patients' identities and highly sensitive medical information: psychosocial evaluations, diagnoses, treatment rationales, informed-consent forms, intake assessments, and family-authorization documents.111 These materials reflect individualized clinical care and deeply personal medical disclosures.112 They do not speak to how products were labeled, marketed, introduced into interstate commerce, or billed to health care benefit plans. We cannot discern how such information is relevant to an inquiry into a "federal health care offense" as Congress defined it or as the Department of Justice describes it here—potential violations of Section 331 of the Food, Drug, and Cosmetic Act relating to a health care benefit program.

*In re: Subpoena No. 25-1431-014*, No. 25-39, at 16 (E.D. Pa. Nov. 21, 2025) (Dkt. 43).

Second, even if the government's objective was to uncover off-label drug promotion by manufacturers (as opposed to permissible off-label use by doctors), requests 11-13 are not relevant to that type of investigation. Request Nos. 11-13 seek personally identifiable documents and communications relating to minor patients who have received gender-affirming care in the form of puberty blockers or hormone therapy. This has nothing to do with potential off-label drug promotion by manufacturers.

A subpoena must be "suitably specific and properly limited in scope," *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000), as the government is not permitted to "rummage through … office files … in the hope of perchance discovering information" that would result in liability, *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973). The subpoena here is an invasive fishing expedition that will undoubtedly disrupt CMN from providing confidential and effective care to its patients.

But most egregiously, the subpoena is overly broad in scope because it seeks *all* sensitive patient medical records and other highly confidential materials. For instance, the subpoena seeks personal health information in the form of billing records, communications among physicians, documents regarding patients' identification (including "by name, date of birth, social security

16

number, address, and parent/guardian information"), documents relating to patients' "clinical indications, diagnoses, or assessments" that formed the basis for prescribing medications, and all documents relating to informed consent, patient intake, and parent or guardian authorization for certain medical treatments. *E.g.*, Request Nos. 2-4, 11-13. The materials sought contain highly regulated protected health information, and the government has failed to provide any justification for why it needs such deeply private and personal medical information. But "how clinicians treated individual children and intimate clinical details shed[s] no light on whether the Hospital introduced a misbranded or unapproved drug into interstate commerce under the [FDCA] and Section 331," so it is not "relevant in purpose to an FDCA investigation." *In re Administrative Subpoena No. 25-1431-030,* No. 25-mc-00063-SKC-CYC, at 8 (D. Colo. Jan. 5, 2026). Such disclosures would have a profound impact on the trust between patients and their providers. Forcing the release of personal health information intrudes on the private decisions made between patients and their doctors. Even the perception that such information could be disclosed undermines patients' confidence in their care. Therefore, the subpoena is not relevant to a lawful purpose because it is overly broad in scope because it seeks *all* sensitive patient medical records and other highly confidential materials.

IV. **Element Four: The Subpoena Requests for Personal Identifying Patient Information are Not Reasonable.**

The Court need only consider this argument if it first finds the Subpoena meets the authorized purpose standard. Even where a subpoena "satisfies the criteria for judicial enforcement," a court must consider seven factors in determining whether "an intrusion into an individual's privacy is justified." *Westinghouse*, 638 F.2d at 576, 578. Those factors are:

> The type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards

17

to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Id*. at 578.

Courts have repeatedly found that medical records are entitled to privacy. *See Kurtenbach v. Jackley*, No. 16-5021-JLV, 2018 WL 1542499 at *8-10 (D.N.D. Mar. 29, 2018) (the United States District Court for the District of North Dakota collected cases considering whether there is a Constitutional right to privacy in medical records). The Court observed that "the constitutional right to privacy extends to the individual interest in avoiding disclosure of personal matters" *Id.* at *8 (citing *Whalen v. Roe*, 429 U.S. 589, 599 (1977)) (cleaned up). "There can be no question that an employee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection." *Id.* (citing *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980)).

## A. The Westinghouse Factors Favor Protecting the Privacy Interests of Limiting the Subpoena.

### 1. "The type of record requested" and "the information it does or might contain" (Factors 1 and 2)

Two features of the information DOJ seeks regarding CMN patients warrant this Court's close attention: First, the Subpoena seeks documents concerning assessments and diagnoses underlying the decisions to prescribe puberty blockers and hormone therapy to patients suffering from gender dysphoria (*see* Subpoena Requests 12–13); and second, the Subpoena demands documents revealing the patients associated with those assessments and diagnoses by name (*see* Subpoena Request 11). By seeking both categories of documents, the Subpoena targets personalized information about the most intimate details of the lives and health of CMN patients.

CMN's process for determining whether to prescribe puberty blockers and hormone therapy involves extensive patient assessments, including a comprehensive psychosocial evaluation of the patient, as well as an evaluation of the patient's cognitive abilities, executive function skills, communication skills, emotional functioning, self-awareness/social cognition, and capacity for decision-making. Ex. 1, at ¶¶ 10-12. Documents created during that process are at the heart of material responsive to the Subpoena. *See* Subpoena Request 12 (demanding "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy"), & 13 (demanding "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization"). As explained in the accompanying CMN Provider Declaration, such records may contain the most intimate details about patients, often touching on such subjects as discomfort with specific body parts, sexual history, past trauma, interfamilial dynamics, use of self-harm or other negative coping mechanisms that might risk their health and well-being such as disordered eating, and experiences of harassment and bullying. *Id.* at ¶¶ 19-20.

"There can be no doubt that [this] information [is] of the types most associated with expectations of privacy." *Murray v. Pittsburgh Bd. Of Educ.*, 759 F. Supp. 1178, 1181 (W.D. Pa. 1991). Indeed, the federal government has expressly acknowledged that such information is uniquely deserving of protection. As the Department of Health and Human Services ("HHS") has explained in the context of psychotherapy notes, "[i]f, in Justice Brandeis' words, the 'right to be let alone' means anything, then it likely applies to having outsiders have access to one's intimate thoughts, words, and emotions." Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82464 (Dec. 28, 2000); *see also Haw. Psychiatric Soc., Dist. Branch of Am. Psychiatric Ass'n v. Ariyoshi*, 481 F. Supp. 1029, 1038 (D. Haw. 1979)

("Constitutionally protected privacy must, at a minimum, include the freedom of an individual to choose the circumstances under which, and to whom certain of his thoughts and feelings will be disclosed.); *see also id.* ("Many courts and commentators have concluded that, because of the uniquely personal nature of mental and emotional therapy, accurate diagnosis and effective treatment require a patient's total willingness to reveal the most intimate personal matters, a willingness that can exist only under conditions of the strictest confidentiality.").

In addition to these Constitutional protections for patient information, HIPAA also protects the information statutorily. "Information about an individual's reproductive health is also especially sensitive and has long been recognized as such." HIPAA Privacy Rule to Support Reproductive Health Care Privacy, 89 Fed. Reg. 32976, 32986, 33005 (Apr. 26, 2024) ("HIPAA Reproductive Health Privacy Rule"); see also id. at 33063 (codified at 45 C.F.R. § 160.103) (defining "reproductive health care" as "health care . . . that affects the health of an individual in all matters relating to the reproductive system and to its functions and processes").

Accordingly, the information covered by the Subpoena is exponentially more sensitive and its potential disclosure far more invasive and consequential than the records at issue in Westinghouse, which included "results of routine testing, such as X-rays, blood tests, pulmonary function tests, hearing and visual tests." 638 F.2d at 579; see also id. ("Westinghouse has not produced any evidence to show that the information which the medical records contain is of such a high degree of sensitivity that the intrusion could be considered severe or that the employees are likely to suffer any adverse effects from disclosure to [agency] personnel.").

Furthermore, tying such critically sensitive information to named patients exacerbates the privacy intrusion. DOJ's explicit request that the records identify patients, coupled with the highly sensitive nature of the records at issue, leaves no doubt that the privacy interests at stake are

20

paramount. Given the nature of the records, redacting the names of patients or using pseudonyms would not mitigate the privacy concerns. The details included in patient files would indicate, for example, the patient's location, the occupation of their parents, ages of their siblings, where they attend school, etc. Armed with those details, it would be far too easy to uncover a patient's identity.

Finally, numerous district courts in the Eighth Circuit held that medical records are entitled to constitutional privacy protection.[11] Any argument that the records could be redacted is not rooted in the reality. The number of patients and number of records associated with each patient would make redaction or use of pseudonyms overly burdensome and extremely expensive and time consuming. The same conclusion from the other Eighth Circuit district courts should occur here, and the subpoena should be quashed.

### 2. "The potential for harm in any subsequent nonconsensual disclosure" (Factor 3)

Courts "rank as an exceptionally serious matter" the "embarrass[ment]" flowing from "the disclosure of sensitive personal information." *Murray*, 759 F. Supp. At 1182. Those concerns abound here. As the CMN Provider explains, if the sensitive and intimate details covered by the Subpoena "were somehow made public" through leaks or otherwise, patients of the Program "could experience embarrassment, humiliation, and trauma from knowing they were publicly

---

[11] *See e.g., Hopkins v. Jegley,* 267 F. Supp. 3d 1024, 1094 (E.D. Ark. 2017) ("Numerous courts have recognized that confidential medical information is entitled to constitutional privacy protection in order to prevent the disclosure of such personal medical records."); *Bolt v. Doe, No. 5:14–CV–5223*, 2014 WL 5797706, at *5 (W.D. Ark. Nov. 7, 2014) (The Fourth Amendment right of privacy "extends to medical test results, medical records, and medical communications.") (referencing *Ferguson v. City of Charleston,* 532 U.S. 67, 78 (2001) ("The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent."); and *Shuda v. Williams,* No. 4:08CV3168, 2008 WL 4661455, at *3 (D. Neb. Oct. 20, 2008) ("By any estimation, medical records must be considered extremely personal and entitled to protection under the fourteenth amendment.")

accessible." Ex. 1, at ¶ 24. Moreover, "[b]ecause the information called for by the Subpoena would encompass records that could include discussion of patients' parents, siblings, friends, teachers, coaches and others, the potential for exposure of sensitive details, embarrassment, humiliation, and trauma extends to those who have little or no connection to the Program and no idea that information concerning them is at issue." *Id.* at ¶ 21.

As devastating as a subsequent, nonconsensual disclosure would be, no such subsequent disclosure need occur for harm to ensue. Rather, even awareness of the Subpoena's request for patient-specific information would detrimentally impact the patient community. "Patients of the Program harbor substantial fears that they are being surveilled or targeted for exposure by opponents of the treatment"—fears that have worsened as prominent government officials have publicly espoused the position that such treatment is tantamount to "maiming" and "mutilation." Ex. 1, at ¶ 18. "Patients and their parents have expressed grave concern with their confidential patient-provider healthcare information being made public, even to investigatory bodies." *Id.* "They have identified that this fear will deter them from participating in the activities that are hallmarks of a happy childhood— school, clubs and other extracurricular activities—out of concern that they will be singled out for being transgender." *Id.* "The mere fact that DOJ has requested detailed information about the treatment they received through the Program will exacerbate patients' fears of being targeted, potentially leading them to further withdraw from public spaces and compromising their ability to live rich, full lives." *Id.*

It appears that DOJ's intention in seeking patient information in an identifiable format, including "documents relating to informed consent, patient intake, and parent or guardian authorization" (Subpoena Request 13), is to approach patients to probe their experiences further. Such interactions with the government, which may be unwelcome to many (if not all) patients,

22

threaten significant harm. "The prospect of patients, their parents, or providers themselves being interviewed by federal agents and prosecutors, particularly in light of DOJ's publicly professed opposition to medical treatment for minor patients suffering from gender dysphoria, would be extremely distressing." Ex.1, at ¶ 20. "Many patients of the Program view the medical care they receive to treat their gender dysphoria as a lifeline. Being questioned about that care and made to feel that their statements could call into question the actions of parents and guardians who supported them, and the healthcare providers who treated them could cause feelings of guilt and fear that would be very damaging to their mental health and could even result in thoughts of, or completed, suicide." *Id.* at ¶ 22. And for patients who are living as the gender with which they identify and may not share their experience with gender dysphoria widely or at all, "being approached by investigators to discuss their treatment could effectively 'out' them as transgender." *Id.* at ¶ 23. That would not only "tak[e] the critical and highly personal decision to share that aspect of their lives out of their hands," it would, tragically, expose them "to an increased risk of harassment, discrimination, and violence." *Id.*

For all of these reasons, the harm associated with disclosure of records sought by the Subpoena cannot be overstated.

> *3. "The injury from disclosure to the relationship in which the record was generated" (Factor 5)*

The same is true for the harm to the relationship in which the records were created—the critical relationship between physician and patient. The patient-provider relationship is fundamental to people living healthy, productive lives. Ex. 1, at ¶ 8. "Confidentiality is central to that relationship, as patients often assume that, in general, sensitive personal information they share with their providers will not be disclosed further." *Id.*

23

It is reasonable to expect that disclosure in response to the Subpoena would have the longer-term effect of chilling patients' willingness to seek medical care in the Program, at Children's Minnesota in general, and with other healthcare providers. *Id.* at ¶ 25. "The chilling effect caused by disclosure of patient records could extend beyond treatment through the Program to other aspects of medical care, such as mental health treatment, preventative care, emergency care, and other subspecialty care, thereby impeding patients' ability to live long, healthy lives." *Id.*

That stands in stark contrast to the facts of *Westinghouse*, which concerned the employer employee relationship, and in which the court found it unlikely "that the disclosures [would] inhibit the employee from undergoing subsequent periodic examinations required of Westinghouse employees." 638 F.2d at 579. Here, the chilling effect absent from Westinghouse not only is present, but it has significant implications for public health and safety. As the CMN Provider Declaration explains, if "[p]atient families believe sensitive health information of their child may be shared in undesired ways, trust is undermined and effective discussions about medical care are more challenging." Ex. 1, at ¶ 26. Pediatric patients who have had their trust in the medical profession compromised in this manner may delay or forgo necessary medical care, compromising their long-term health outcomes. *Id.* "The potential harms associated with DOJ's Subpoena would not be limited to patients of the Program." Ex. 1, at ¶ 28. Rather, "[c]ompliance with the subpoena would set a precedent that federal law enforcement agencies can seek and obtain sensitive health information of anyone based on skepticism about a particular form of medical treatment." *Id. See also Nw. Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) ("If Northwestern Memorial Hospital cannot shield the medical records of its . . . patients from disclosure in judicial proceedings . . . the hospital will lose the confidence of its patients, and

24

persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment.").

### B. The Westinghouse Factors on the Other Side of the Ledger Do Not Outweigh the Privacy Interest

*1. "The adequacy of safeguards to prevent unauthorized disclosure" (Factor 4)*

Factor 4 does not tilt the balance towards the Subpoena's full enforcement. For one thing, no safeguards to protect against disclosure of information produced in response to the Subpoena will prevent the harm flowing from disclosure to DOJ. As described above, that harm is real and significant.

Further, DOJ has not demonstrated that subsequent disclosures will not occur. And CMN is unaware of any specific statutory or regulatory provision broadly prohibiting disclosure of patient specific health information obtained pursuant to a section 3486 subpoena. Although section 3486(e)(1) sets a "limitation on use," that provision specifically refers to disclosures "for use in . . . any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information," 18 U.S.C. § 3486(e)—in other words, investigations and actions against the patient. By its terms, subsection (e)(1) does not apply to any other disclosures. And while the DOJ Manual's section on Health Care Fraud states that "[t]here are restrictions on the derivative use of protected health information," the same section directs readers to an Executive Order expressly stating that it does not "place any additional limitation on the derivative use of health information obtained by the Attorney General pursuant to the provisions of 18 U.S.C. 3486." *See* U.S. Department of Justice, Just. Manual, § 9-44.150 (Jan. 2020) (citing Executive Order 13181, To Protect the Privacy of Protected Health Information in Oversight Investigations (Dec. 20, 2000) ("E.O. 13181"))[12]; *see also* E.O. 13181,

---

[12] https://www.justice.gov/jm/jm-9-44000-health-care-fraud#9-44.100#9-44.100

§ 1 ("Under 18 U.S.C. 3486, an individual's health records obtained for health oversight purposes pursuant to an administrative subpoena may not be used against that individual patient in an unrelated investigation by law enforcement unless a judicial officer finds good cause.").

Moreover, there is reason to think that DOJ will disclose the information learned pursuant to the Subpoena. As described, DOJ has announced its intention to partner with states to address issues related to medical treatment for gender dysphoria, including the use of puberty blockers and hormones. AG Memo, *supra* note 3, at 5. That partnership will include "identify[ing] leads, shar[ing] intelligence, and build[ing] cases against hospitals and practitioners." *Id*. Absent a broad prohibition on sharing, the AG's publicly professed intention to work with the states suggests that DOJ might well provide patient-specific data where relevant to law enforcement activity. *See* 18 U.S.C. § 3486(e)(1); 5 U.S.C. § 552a(b)(7) (Privacy Act provision permitting disclosure to state law enforcement officials). Such information sharing would significantly raise the risk of the information becoming public. Cf. *Westinghouse*, 638 F.2d at 580 (describing government agency's extensive controls around information contained in medical files and specific restrictions on disclosure).

Similarly, some DOJ officials have indicated a willingness to disclose information to Congress despite the Department's historical practice of "declin[ing] to provide Congressional committees with access to open law enforcement files."[13] FBI Director Kash Patel recently explained that he is "committed to congressional oversight" and to "giving Congress the documents they need to do their work and give them to the American people," adding that

---

[13] Letter from U.S. Dep't of Just., Off. Leg. Affairs to Hon. John Linder, Chairman, Subcomm. on Rules & Organization of House Comm. on Rules, at 3 (Jan. 27, 2000), https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/linder.pdf.

26

documents would be provided "unredacted."[14] Such disclosures also are not subject to the Privacy Act, *see* 5 U.S.C. § 552a(b)(9), and thus could result in the public dissemination of sensitive patient information.

Unauthorized disclosures are possible as well. Despite applicable statutes and DOJ rules and policies concerning the secrecy of active investigations,[15] revelations are not uncommon. Indeed, details about related government efforts to gather information regarding providers of medical treatment for gender dysphoria have already leaked.[16] Other confidential investigations have been reported in the press as well in recent years, and DOJ has also been accused of failing to comply with the non-disclosure obligations imposed under the Privacy Act.[17]

> *2. "The degree of need for access," and whether "there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access" (Factors 6 and 7)*

The final two factors do not tip the scales in DOJ's favor. With respect to Factor 6, the need for access, DOJ has multiple avenues to investigate health care offenses without intruding on patient privacy. The Department can investigate off-label marketing of puberty blockers and hormone therapy without probing patient histories. It can review CMN's billing practices without

---

[14] Chuck Grassley, FBI Director Kash Patel Talks Senator Grassley Oversight with Joe Rogan, Facebook (June 11, 2025), https://www.facebook.com/grassley/videos/fbi-director-kash-patel-talks-senator-grassley-oversight-with-joerogan-what-did/1006621698126020/.

[15] *See, e.g.*, Just. Manual § 1-7.000 (Apr. 2018), https://www.justice.gov/jm/jm-1-7000-media-relations; U.S. Dep't of Just., Civil Rights Div., When Does the Division Announce Investigations? (Oct. 18, 2018), https://www.justice.gov/crt/when-does-division-announce-investigations.

[16] *See, e.g.*, Liz Essley Whyte, Trump Administration Weighs Eliminating Funds for Hospitals Offering Gender Care to Minors, WALL ST. J. (June 30, 2025), https://www.wsj.com/health/healthcare/gender-surgery-childrens-hospitalstrump-282c4cbb?reflink=desktopwebshare_permalink; James Lynch, FBI Launches Investigation into Alleged Genital Mutilation at Children's Hospitals, NAT'L REV. (June 25, 2025), https://www.nationalreview.com/news/fbilaunches-investigation-into-alleged-genital-mutilation-at-childrens-hospitals/.

[17] DOJ has also been imperfect in adhering to the Privacy Act. See *Strzok v. Barr et al.*, 19-cv-2367 (D.D.C. 2019).

knowing what patients discussed in their psychosocial evaluations. And it can assess the Program's policies and practices for informed consent by reviewing those policies and practices, along with supporting documents. DOJ also has expressly solicited whistleblower testimony related to issues surrounding transgender health care for minors. *See* AG Memo, *supra* note 3, at 4- 5. With many other options at its disposal, DOJ has no need to engage in a dragnet-style effort to gather information from unwilling patients, potentially traumatizing them and their loved ones in the process.

With respect to Factor 7, there is no dispute that 18 U.S.C. § 3486 affords DOJ latitude to undertake investigations of healthcare offenses. But that is not enough to justify the Subpoena's sweeping demand for health information about CMN patients. If it were, the other *Westinghouse* factors would be entirely superfluous. Those factors are critical to the "delicate task of weighing [the] competing interests" when the government seeks information the disclosure of which raises significant privacy concerns. 638 F.3d at 578. Indeed, *Westinghouse* itself weighed those competing interests after recognizing "the comprehensive statutory scheme dealing with occupational health and safety" and the agency's authority "to issue subpoenas to obtain the production of evidence," *id*. at 575, 578-79 (citing 29 U.S.C. §§ 657(b), 669(b)). Accordingly, the simple fact that DOJ has statutory authority to issue a subpoena does not answer the question whether the Department's need for the information sought overcomes the essential privacy interests weighing against disclosure.

### V.   CMS Has Deferred to Minnesota's "More Stringent" Patient Privacy Regulations

Finally, CMS has a strong policy against disclosure of patient records that is in conflict with the DOJ's apparent rationale for demanding production here and has also recognized Minnesota's heightened and more stringent standards in favor of the privacy interests of patients.

Under 42 C.F.R. § 482.24(b)(3), CMN "must have a procedure for ensuring the confidentiality of patient records. Information from or copies of records may be released only to authorized individuals, and the hospital must ensure that unauthorized individuals cannot gain access to or alter patient records." These federal regulations why against disclosure here. The federal Medicaid program also contains restrictions that weigh against compelling CMN from disclosing the patient records to DOJ. For example, 42 CFR 455.410(b) provides that "[t]he State Medicaid agency must require all ordering or referring physicians or other professionals providing services under the State plan or under a waiver of the plan to be enrolled as participating providers." Separately, 42 C.F.R. 431.108(b)(2) provides that Medicaid provider agreements will be effective, among other things, on the date the provider meets "[a]ny other requirements imposed by the State for participation in the Medicaid program." The Provider Agreement that the Minnesota Department of Human Services ("DHS") obligates all health care providers to sign as a condition of enrolling and participating in Minnesota's Medical Assistance Program provides, in part, that providers must "ensure proper handling and safeguarding of … 'protected information' [which] means data subject to any of the laws described [in this section of the Provider Agreement]"…This responsibility includes … [t]he Minnesota Medical Records Act, Minnesota Statutes 144.191—144.298."  CMN is a party to this Provider Agreement with DHS.

Under Minn. Stat. 144.293, a health care provider may not release a "patient's health records to a person" without obtaining consents that have not been obtained here. Minn. Stat. 144.293, subd. 2. Minnesota law further provides that the MHRA "must be construed to protect the privacy of a patient's health records in a more stringent manner than provided in" HIPAA. Minn. Stat. 144.2925.  The term "more stringent" has the "meaning established under" 45 C.F.R. § 160.202 "with respect to a use or disclosure or the need for express legal permission from an

29

individual to disclose individually identifiable health information". *Id.* The patients have not consented to the release and there is no specific authorization in Minnesota law permitting the release.

Further, the State Medicaid Plan—which is the contractual agreement between the federal government, acting through the Centers for Medicare and Medicaid Services, and the State of Minnesota under which administration of the Medicaid program occurs (the "State Plan")—includes provisions that make clear the confidentiality protections established under State law are intended to apply to the Medicaid program. For example, the State Plan provides that: "A provider must meet any standards established, and obtain any licensure required. under state law or rules for the applicable type of health care provider or entity" subject to an unrelated exception. MN State Medicaid Plan, Ch. 4, p. 17. The State Plan also provides that, "[t]he Provider Agreement requires that providers agree, as a condition of participation in the Medicaid program, to comply with all federal and state statutes and rules. The provider agreement is signed by all providers, including managed care organizations and all other entities to whom section 1902(a)(68) applies. All providers are informed that failure to comply risks their participation in the Medicaid program." *Id.* at p. 1035. CMS is a party to, and has specifically approved, the Plan.

In short, in the face of these clear expressions of federal and state policies that weigh heavily against disclosure, the DOJ has an elevated burden to demonstrate a need for production that it has not satisfied here.

## CONCLUSION

CMN respectfully moves to quash the Subpoena to the extent that it seeks personally identifying patient information, including but not limited to Requests 11-13. CMN does not categorically contest the Department of Justice's authority to review its conduct or to initiate an

investigation through a subpoena issued under Section 3486, but Requests 11, 12, and 13, and any and all other Requests to the extent that such Requests or sub-Requests call for the production of the identities or records of patients or their families of Children's Health Care d/b/a Children's Minnesota should be quashed.

Dated: May 4, 2026

LATHROP GPM LLP

By: */s/ David Archer*
David Archer (#0399150)
80 South 8th Street
3100 IDS Center
Minneapolis, MN  55402
Telephone: (612) 632-3000
David.archer@lathropgpm.com

Jean Paul Bradshaw II (MO Bar #031800)
*Pro Hac Vice Forthcoming*
Jackson R. Hobbs (MO Bar #71004)
*Pro Hac Vice Forthcoming*
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108
Telephone:  816.460.5507
jeanpaul.bradshaw@lathropgpm.com
jackson.hobbs@lathropgpm.com

**ATTORNEYS FOR CHILDREN'S MINNESOTA**