**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| In the Matter of Subpoena Duces Tecum No. 25-1431-017 to Children's Health Care d/b/a Children's Minnesota | **DECLARATION OF A. KADE GOEPFERD, MD IN SUPPORT OF MOTION TO QUASH SUBPOENA** |

I, the undersigned, declare as follows:

I make this declaration based on professional knowledge and experience and a review of the administrative subpoena issued by the U.S. Department of Justice ("DOJ") to Children's Health Care d/b/a Children's Minnesota. ("Children's Minnesota") on June 11, 2025 (the "Subpoena"). If called as a witness, I could and would competently testify to the following.

**A. Background**

1.     I, A. Kade Goepferd, am a licensed staff physician at Children's Minnesota, where I serve as the Chief Education Officer, Clinical Director of Equity and Inclusion and Pediatrician in the Gender Health Program. I founded and served as the Medical Director for the Gender Health Program at Children's Minnesota from 2019-2025. I earned my Doctor of Medicine degree from the University of Minnesota in 2004, with honors. I completed residency training in Pediatrics at the University of Minnesota from 2004-2007. I have been board certified by the American Board of Pediatrics since 2007. I also hold an academic appointment as Adjunct Assistant Professor in the Department of Pediatrics at the University of Minnesota. I am a nationally recognized expert in essential healthcare for transgender and gender diverse youth, having cared for hundreds of

patients in the Children's Gender Health Program since 2019 (and before that in my primary care practice at Children's Minnesota).

2.      I also support Children's Minnesota's competencies in care and practice for LGBTQ+ patients, guests, families, and staff throughout the hospital network.

3.      CMN is committed to providing evidence-based, high-quality and essential health care to all kids, including transgender and gender diverse patients.

4.      CMN provides a safe and inclusive environment for transgender and gender diverse youth and their families to ask questions, seek support and access evidence-based mental health and medical care. I frequently provide information and referrals to community-based resources as well.

5.      CMN's Gender Health program includes initial and follow-up consultations with patients and families and mental health assessments and referrals as needed.

6.      In addition, CMN offers medical treatment and monitoring, which may include: puberty delaying medications; gender-affirming (pubertal) hormones; menstrual suppression; and fertility preservation consultation.

7.      CMN does not perform gender affirming surgeries.

B.  **The Program's Assessment and Treatment Practices**

8.      The patient-physician relationship is a sacred and fundamental part of any medical encounter and is fundamental to patients reaching their optimal health potential. Confidentiality is central to that relationship, as patients often assume that, in general, sensitive personal information they share with their providers will not be disclosed further. This is particularly the case for youth and adolescents, whose privacy is tantamount as they navigate their growing bodies, developing identities and sensitive health issues with their medical provider.

9.    In addition to the relationship with the youth themselves, families and parents are at the center of all decision-making related to the care delivered to patients of the Gender Health Program. No child or adolescent can be seen in the Gender Health Program without the knowledge and consent of their parent or legal guardian. All families accessing care in our clinic begin with an assessment conducted by a licensed mental health provider. The minor patient and the parent(s)/legal guardian(s) then have a series of appointments with a licensed mental health specialist specifically trained in child and adolescent development prior to meeting with one of our medical providers

10.    Initial mental health assessment appointments are completed with both the patient and parent(s)/legal guardian(s) to understand the patient's history of gender expression and identity, assess any concurrent mental health diagnosis as well as any need for additional patient or family mental health/psychosocial support.

11.    If medical treatment for gender dysphoria is being considered, particularly gender-affirming hormone treatment, the assessment process will include a comprehensive psychosocial evaluation of the patient, as well as an evaluation of the patient's cognitive abilities, executive function skills, communication skills, emotional functioning, self-awareness/social cognition, and capacity for decision-making.

12.    Any and all care plans/recommendations for patients are determined based on the diagnostic outcome of the mental health and medical assessment processes and are dependent on the patient's age, development, and the particular needs and desires of the patient and the family. Each patient and family will have a uniquely tailored care plan based on their mental health and medical assessments.

13.    After the assessment process, if the patient is diagnosed with gender dysphoria and the patient family and multidisciplinary care team agree that treatment is appropriate, the patient, the family, and the care team proceed with the agreed-upon plan of care.

14.    Consistent with the shared decision-making model, prior to any medical treatment being administered, a Children's Minnesota physician and mental health provider discuss the patient's needs, the outcome of the mental health assessment, any recommended treatments, treatment risks, benefits, and alternatives, and any concerns or other issues with the parent(s)/legal guardian(s) and the patient.

15.    Medical treatments proceed only after informed consent is obtained from parent(s)/legal guardian(s) with medical decision-making authority over the minor patient and the minor patient provides their assent to care.

## C.  The Impact of the Subpoena on Current, Former, and Prospective Program Patients

16.    DOJ's demand for personal health information of current and former Program patients would have a profoundly detrimental impact on Program patients and their families.

17.    Patients who seek care from the Program are typically experiencing complicated, deeply personal discomfort related to their gender. Many are victims of discrimination in their communities, including frequent school-based harassment from peers based on their identities. Accordingly, patients view the Program as a safe space to share their experience without fear of repercussions. While patients are informed that there are circumstances in which their medical records can be disclosed, they would not anticipate a sweeping request from federal prosecutors for their most sensitive health information simply because they sought treatment through the Program. Disclosure of medical records in this manner will compromise the integrity of the safe space the Program has become for patients and families and violate the trust of the doctor-patient relationship that our teams have worked on over months and years to build with patients and their families.

18.     Losing that safe space is costly, particularly in light of the environment patients and families are experiencing today, where prominent government officials are loudly expressing their opposition to medical treatment for gender dysphoria for minors. Patients of the Program harbor substantial fears that they are being surveilled or targeted for exposure by opponents of the treatment. Patients and their parents have expressed grave concern with their rights to confidential patient-provider healthcare information being made public, even to investigatory bodies. They have identified that this fear will deter them from participating in the activities that are hallmarks of a happy childhood—school, clubs and other extracurricular activities— out of concern that they will be singled out for being transgender. The Program is a place where they can engage with others and be their true selves. The mere fact that DOJ has requested detailed information about the treatment they received through the Program will exacerbate patients' fears of being targeted, potentially leading them to further withdraw from public spaces and compromising their ability to live rich, full lives.

19.     If Children's Minnesota is forced to comply with the Subpoena, it is reasonable to expect that the disclosure of records will prove traumatic for Program patients. As previously explained, when a diagnosis of gender dysphoria is being considered, the Program will conduct a comprehensive psychosocial evaluation of the patient. This evaluation typically involves patients sharing intimate and extremely sensitive personal details, often touching on such subjects as discomfort with specific body parts, sexual history, past trauma, interfamilial dynamics, use of self-harm or other negative coping mechanisms that may risk their health and well-being such as disordered eating, and experiences of harassment and bullying. Knowing that prosecutors and investigators would become privy to that information, and possibly made available to the public, will be experienced by patients and their parents as a tremendous violation of their privacy by their healthcare providers, by Children's

Minnesota, and by healthcare facilities in general. This type of breach of privacy could be perceived as catastrophic to our adolescent patients, and exacerbate or trigger negative mental health symptoms.

20.     If, beyond receiving the information responsive to the Subpoena, federal prosecutors and investigators use that information to identify and approach patients to interview them about the care they received, the negative effects would be significantly amplified. Many Program patients are extremely reticent to discuss their experience with gender dysphoria with anyone outside of their family and clinical team, much less federal law enforcement officials. The prospect of being interviewed by federal agents and prosecutors, particularly in light of DOJ's publicly professed opposition to medical treatment for minor patients suffering from gender dysphoria, would be extremely distressing.

21.     Because the information called for by the Subpoena would encompass records that could include discussion of patients' parents, siblings, friends, teachers, coaches and others, the potential for exposure of sensitive details, embarrassment, humiliation, and trauma extends to those who have little or no connection to the Program and no idea that information concerning them is at issue.

22.     Other problems could be expected to flow from those interactions as well. Many patients of the Program view the medical care they receive to treat their gender dysphoria as a lifeline. Being questioned about that care and made to feel that their statements could call into question the actions of parents and guardians who supported them, and the healthcare providers who treated them; could cause feelings of guilt and fear that would be very damaging to their mental health; and could even result in thoughts of, or completed, suicide.

23.     In addition, some patients of the Program live as the gender with which they identify and many are very selective about with whom they choose to share their prior experience with gender dysphoria. For those patients, being approached by investigators to discuss their treatment could effectively "out" them

6

as transgender, thus taking the critical and highly personal decision to share that aspect of their lives out of their hands. Unfortunately, being identified as transgender could also expose patients to an increased risk of harassment, discrimination, and violence. As the DOJ is requesting records as far back as 2020, many of these patients have since transitioned to their adult lives and care. Being approached at this point to discuss their youth transition experiences would not only be intrusive to their privacy and disruptive to their current adult lives, whether it be in college or in their career, but may also recall past childhood experiences of trauma and bullying relating to their identities and resurface pain that they have left well behind them as young adults.

24.    In the event that records produced in response to the Subpoena were somehow made public, we expect patients would experience additional significant harm. As these records contain deeply personal details about gender dysphoria, sexual histories, interpersonal relationships, and mental health, patients could experience embarrassment, humiliation, and trauma from knowing they were publicly accessible. Depending on where patients now live, given that some of our patients are now adults and young adults in college and in their careers, this could result in them being removed from housing, being fired from jobs and/or experiencing violence and threats where they currently reside. Current youth patients whose public information was exposed would similarly be subject to removal from clubs and sports teams, denied access to public facilities in their schools and communities and/or subject to violence and threat depending on the communities in which they reside.

25.    In addition to those immediate impacts, it is reasonable to expect that disclosure in response to the Subpoena would have the longer-term effect of chilling patients' willingness to seek medical care in the Program, at Children's Minnesota in general, and with other healthcare providers. In our experience, patients of the Program are often already reticent to engage with healthcare providers because many have had negative experiences as a result of anti-transgender bias. The chilling effect caused by disclosure of

7

patient records could extend beyond treatment through the Program to other aspects of medical care, such as mental health treatment, preventative care, emergency care, and other subspecialty care, thereby impeding patients' ability to live long, healthy lives. We already know that transgender youth and their families experience health care disparities relative to their ability to access safe and competent healthcare, and the release of their private medical records would further exacerbate this access issue and widen the disparity gap.

26.     If patients' families believe sensitive health information of their child may be shared in undesired ways, trust is undermined and effective discussions about medical care are more challenging. Pediatric patients who have had their trust in the medical profession compromised in this manner may delay or forgo necessary medical care, compromising their long-term health outcomes beyond seeking gender health related care.

27.     Even if patients remain willing to engage with healthcare providers after a disclosure in response to the Subpoena, they may be less candid in their communications, which would compromise opportunities for effective treatment.

28.     The potential harms associated with DOJ's Subpoena would not be limited to patients of the Program. Compliance with the subpoena would set a precedent that federal law enforcement agencies can seek and obtain sensitive health information of anyone based on skepticism about a particular form of medical treatment and the gender identities of the patients receiving care. It should be noted that other patients at Children's Minnesota routinely receive treatment with puberty delaying medications and hormones for other medical conditions, and their medical records are not the subject of the Subpoena. It is only our transgender and gender diverse patients and their families who have been put in the precarious position of having their medical privacy compromised.

8

9

29.     For all of those reasons, I believe disclosure of the information called for by the

Subpoena threatens significant harm to our patients and their families.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  May 4, 2026                    By:    _/s/ A. Kade Goepferd, MD_

                                       **A.  Kade Goepferd, MD**